UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

JARED RENE

                            Plaintiff,

              v.                           Case No.: _____

TOWN OF GREECE,                        **COMPLAINT**
WILLIAM D. REILICH,                **JURY TRIAL**
in his capacity as Town Supervisor,      **DEMANDED**
MICHELLE MARINI, in her capacity as
former Deputy Town Supervisor, and
MICHAEL WOOD,  in his
Official Capacity as Chief of Police,
                         Defendants.

      Former Greece Police Sergeant Jared Rene ("**Sergeant Rene**"), by and through his attorneys, Abrams Fensterman, LLP, for his Complaint against the Town of Greece, William D. Reilich, Michelle Marini and Michael Wood alleges as follows:

**<u>Preliminary Statement</u>**

      1.    For nearly 15 years, former Sergeant Jared Rene ("**Sergeant Rene**") earned an unblemished record and reputation while he worked at the Greece Police Department ("**GPD**") largely under the command of Chief Phelan.  After Chief Phelan left in 2021, Sergeant Rene was exposed to the misconduct and politics of Bill Reilich and Michelle Marini, which included the disparate treatment of minority communities and concealment of criminal conduct including a senior official's driving under the influence vehicle crash.  Sergeant Rene joined other senior law enforcement officers in objecting to and reporting the misconduct of Greece officials.  In response, Police Chief Michael Wood drove those officers out of the GPD because cops who report or

investigate corruption in Greece "have to go."  This action seeks to make Sergeant Rene whole in connection with the Defendants' concerted efforts to destroy his exemplary career.

**Jurisdiction and Venue**

2.      This Court has original jurisdiction pursuant to 28 U.S.C. § 1331, because Sergeant Rene's claims arise under 42 U.S.C. § 1983 and 29 U.S.C. § 206.

3.      The supplemental jurisdiction of this Court is invoked pursuant to 28 U.S.C. § 1367 over all other claims.

4.      Venue in this district is appropriate pursuant to 28 U.S.C. § 1391(b)(1) and (2), as all Defendants reside in this district and a substantial part of the events giving rise to the claims occurred in this district.

5.      Sergeant Rene demands a jury trial.

**The Parties**

6.      Sergeant Rene is an individual residing at 2062 Bronson Hill Road, Avon, New York 14414.

7.      Upon information and belief, the Town of Greece ("**Greece**" or the "**Town**") is a municipal corporation, having its principal office at 1 Vince Tofany Blvd., Greece, New York 14612-5030.

8.      Upon information and belief, Michael Wood ("**Chief Wood**") is the Chief of the GPD with an office at 6 Vince Tofany Blvd., Greece, New York 14612-5030.

9.      Upon information and belief, Town Supervisor William "Bill" D. Reilich ("**Mr. Reilich**") is an individual residing at 462 Melwood Drive, Rochester, New York 14626.

10.     Upon information and belief, former Deputy Town Supervisor Michelle Marini ("**Ms. Marini**") is an individual with an office at 1 Vince Tofany Blvd., Greece, New York 146210-5030.

**Sergeant Rene's Background**

11.     Sergeant Rene grew up in Irondequoit and graduated from Northstar Christian Academy as a Section 5 basketball leading scorer in 2001.

12.     Sergeant Rene attended Roberts Wesleyan University on an academic and sports scholarship.

13.     In 2004, Sergeant Rene scored in the top 95% of test takers who took the Monroe County Civil Service test.

14.     In May 2005, Sergeant Rene graduated from the Monroe County Police Academy and was hired by the Monroe County Sheriff's Office where he earned the Life Saving Award.

15.     In March 2009, Sergeant Rene transferred to the GPD and in 2014, he was promoted to GPD Sergeant.

16.     As a GPD Sergeant, Sergeant Rene was a member of the Gold Badge Club Union (the "**Union**") and was subject to a collective bargaining agreement (the "**CBA**").

17.     Sergeant Rene received numerous GPD awards, including: the 2015 Leadership Award (an award requiring peer nomination), 3 Commendations, 6 Excellent Police Service Awards, and 5 Chief's Letters of Recognition.  Sergeant Rene also served on the Crime Scene Technicians Unit and the Crisis Negotiation Team; and was a Defensive Tactics Instructor, Police Academy Instructor and a Field Training Officer.

18.     In June 2014, as a result of his impeccable reputation for honesty, judgment, trustworthiness and integrity, the GPD designated Sergeant Rene the Community Services Sergeant ("**CSS**") and Public Information Officer ("**PIO**").

19.      As CSS, Sergeant Rene was responsible for Greece school resource officers, the school DARE program, animal control unit, the intern program, the Explorer Post, the Teen Academy, grant administration, grant funded traffic enforcement, special event coordination, GPD's social media presence, the desk officer, and the Crossing Guard unit.

20.     As PIO, Sergeant Rene was responsible for media requests regarding official information on noteworthy incidents, department initiatives, high profile investigations or arrests, and any other questions or specific requests from the media.

21.     The GPD provided a cell phone to the CSS and PIO Sergeant, as that individual was required to answer calls and inquiries 24 hours a day.

22.     Pursuant to a 2014 Memorandum of Understanding between the Town and the Union (the "**Cell Phone MOU**"), the individual monitoring that cell phone (Sergeant Rene or a substitute if Sergeant Rene was indisposed) was entitled to a weekly stipend of approximately $80.00.

23.     The Cell Phone MOU required Greece to provide advance notification should the payment of the stipend ever cease.

**Sergeant Rene's Interactions with Town Hall**

24.     From 2014 through 2020, Sergeant Rene served under Chief Patrick Phelan and received his orders and direction from Chief Phelan and other members of GPD leadership.

4

25.    In 2020, Sergeant Rene began receiving "Town Hall" orders from Ms. Marini outside of the GPD chain of command because Chief Phelan was not "playing ball" and was not "doing what was asked of him."

26.    In Spring 2021, Mr. Reilich appointed Andrew Forsythe as the new GPD Chief ("**Chief Forsythe**") and shortly after, Sergeant Rene attended a meeting with Chief Forsythe, Ms. Marini and Mr. Reilich.

27.    At the meeting, Mr. Reilich said that he expected the organizers of the June 2020 Black Families Matter rally to organize another rally in connection with the death of Daniel Prude and he wanted to discuss GPD's response.

28.    During the meeting, Mr. Reilich criticized Chief Phelan's handling of the Black Families Matter rally.  In referring to the persons who organized and attended the rally, Mr. Reilich said that Chief Phelan had "catered to *those people*" and "let *those people* walk over him." Mr. Reilich also criticized Chief Phelan for having closed a road for attendees and stated that no other roads were to be closed for "*those people*."

29.    Mr. Reilich stated that "*those people"* were not going to "tell him how to run" his Town.

30.    During the meeting, Mr. Reilich and Ms. Marini told Chief Forsythe and Sergeant Rene that Chief Phelan "had to go" because of the way he handled "*those people*" and because he had called an "outside agency to investigate corruption."

31.    After that meeting, Sergeant Rene learned that Greece was withdrawing support that it had previously provided to events in minority communities.

32.    Upon information and belief and based upon their commentary at the previous meeting, Ms. Marini and Mr. Reilich established this discriminatory policy.

33.    For example, Greece exponentially increased the established permit fee for an event in a predominantly minority community scheduled to take place in August 2021.

34.    Upon information and belief, Ms. Marini and Mr. Reilich knew this policy would result in disparate and unfavorable treatment of Greece's minority communities.

35.    Upon information and belief, these actions were in violation of the law, including but not limited to Greece's Code of Ethics, the New York State Constitution and the Equal Protection Clause of the Fourteenth Amendment to the U.S. Constitution.

36.    Sergeant Rene objected to, reported, and complained about these actions and policies to his supervisor and community leaders.

37.    Sergeant Rene's criticisms and reporting of discriminatory policies were not part-and-parcel of his concerns about his ability to properly execute his official job duties.

38.    Sergeant Rene's speech was prompted by his objections to the policy, especially as he believed the policy would have a particularly disparate impact on Greece's youth. Sergeant Rene disregarded the discriminatory policy and even personally paid for a bounce house at an event that he felt the Town had wrongly failed to support.

39.    Chief Forsythe supported Sergeant Rene's official and unofficial efforts to continue to develop GPD's relationship with Greece's minority and disenfranchised communities.

40.    In or around September 2021, Ms. Marini and Mr. Reilich learned about Sergeant Rene's comments, criticisms and actions regarding the Town's discriminatory and disparate treatment of minorities.

41.    In late September 2021, Chief Forsythe called Sergeant Rene on the way to work and told him that Ms. Marini and Mr. Reilich had heard about Sergeant Rene's comments,

criticisms and actions and that they were "furious" because Sergeant Rene had traveled "outside his lane."

42.     Chief Forsythe told Sergeant Rene that Mr. Reilich and Ms. Marini wanted him to take action against Sergeant Rene.

43.     Instead, Chief Forsythe counseled Sergeant Rene that Mr. Reilich and Ms. Marini did not consider African American community leaders to be "friends of (their) administration" and that he should consider their call to be a warning.

**The Chief's Car Accident**

44.     On or around October 21, 2021, Chief Forsythe crashed his fleet vehicle while he was driving under the influence of alcohol.

45.     The vehicle crash was twelve (12) days before the Greece town supervisor election.

46.     Upon information and belief, Chief Forsythe contacted Ms. Marini from the crash site and she directed him to conceal the crime(s).

47.     Ms. Marini did not report the crash to any authority.

48.     Ms. Marini did not report the involvement of alcohol in the crash to any authority.

49.     Upon information and belief, hours later, Ms. Marini took additional steps to conceal her actions and omissions including, but not limited to sending pretextual text messages.

50.     During the next two days, Ms. Marini arranged for Sergeant Rene to release false and misleading information about the crash to the media.

51.     On October 26, 2021, Ms. Marini provided information about her actions to the Monroe County District Attorney in a recorded interview that was false, inaccurate and/or misleading.

52.     Upon information and belief, this false information was provided to the District Attorney's office with an intent to conceal a crime, obstruct justice and hinder prosecution.

53.     On or about October 26, 2021, Sergeant Rene reported to his acting Chief that Ms. Marini had information about the crash that she had not shared with GPD.

54.     Specifically, Sergeant Rene confirmed that Ms. Marini had approved the information that was provided to the press and that she had known alcohol was involved in the crash.

55.     On or about October 27, 2021, Sergeant Rene's supervisor told him that, per the direction of Ms. Marini, he was temporarily relieved of his PIO duties.

56.     Sergeant Rene's removal was an adverse employment action, as that sudden change gave the impression that Sergeant Rene had done something wrong which negatively impacted his credibility and reputation.

57.     Weeks later, Sergeant Rene was moved from the Community Services Unit to the Road Patrol Division.

58.     The Road Patrol Division was widely viewed in the GPD as a less favorable assignment than the Community Services Unit.

59.     Sergeant Rene's change of assignment was an adverse employment action as that sudden change prompted the inference that Sergeant Rene had done something wrong and that negatively impacted his credibility and reputation.

60.     In connection with his new assignment, Acting Deputy Chief Ryan Parina ("**Deputy Chief Parina**") ordered Sergeant Rene to retain the GPD cell phone that was required to be answered at all times.

61.     Acting Deputy Chief Parina told Sergeant Rene to continue to answer the phone, communicate with community members and report media requests to his supervisors.

62.     Pursuant to the Cell Phone MOU, as long as Sergeant Rene had to keep and answer the phone, Greece had to pay the stipend.

63.     On December 8, 2021, Sergeant Rene provided testimony to Special Deputy Chief Joseph Morabito in connection with his investigation into Greece's response to Chief Forsythe's crash.

64.     Sergeant Rene testified about the information that he had already reported to his supervisor(s) – that Ms. Marini had failed to report information to the GPD and taken actions to conceal details of the crash.

65.     Upon information and belief, Sergeant Rene's testimony provided evidence that Ms. Marini had been involved in and/or directed the concealment of crimes and misconduct.

**Retaliation**

66.     Before September 2021, Sergeant Rene had a spotless record.

67.     Before September 2021, Sergeant Rene had never been the subject of an internal affairs investigation.

68.     Before September 2021, Sergeant Rene had never had a personnel complaint filed against him.

69.     Before September 2021, Sergeant Rene had never received a reprimand or discipline of any kind.

70.     Before September 2021, Sergeant Rene was the face of the GPD in the media, in the community and in the law enforcement circles where he provided training to officers and other departments.

71.     Between August 2021 and December 2021, Sergeant Rene reported (1) government and individual actions and policies that had a disparate impact on a minority group, and (2) Ms. Marini's misconduct in connection with Chief Forsythe's crash.

72.     Sergeant Rene's actions made him a whistleblower, and as such, Sergeant Rene was entitled to protection from retaliation.

73.     Instead of protection, Sergeant Rene was subjected to a pattern of unrelenting retaliation and retribution as described in the following paragraphs.

**The Retaliation and Constructive Discharge Events**

*Adverse Job Changes*

74.     In September 2021, Chief Forsythe told Sergeant Rene that he was in jeopardy of being removed from his assignment to the Community Service Unit because Mr. Reilich and Ms. Marini were furious that he had traveled "out of his lane" in complaining about the treatment of communities who were not "friends of the administration."

75.     In October 2021, Sergeant Rene was removed from the Community Service Unit and placed on road patrol.

*The Morabito Report and Reprimand*

76.     On or about December 21, 2021, Special Deputy Chief Joseph Morabito issued his report regarding an investigation into Chief Forsythe's crash (the "**Morabito Report**.")

77.     Upon information and belief, this report was drafted and/or directed in part by Ms. Marini.

78.     Even though Sergeant Rene had provided testimony about Ms. Marini's failure to report details of the crash, the Morabito Report found Sergeant Rene guilty of failing to report details of the crash.

79.     As a result of the Morabito Report, Sergeant Rene received a reprimand.

80.     Upon information and belief, Sergeant Rene's reprimand, the first in his career, was an adverse employment action and was an attempt to impugn his reputation and retaliate against him for his whistleblowing activities.

***Command Staff's Acknowledgement of Retaliation***

81.     In or around late January or early February 2022, Chief Wood and Deputy Chief Naser Zenelovic ("**Deputy Chief Zenelovic**") met with Sergeant Rene.

82.     During that meeting, Chief Wood and Deputy Chief Zenelovic told Sergeant Rene that he was "a target of Town Hall."

83.     During that meeting, Chief Wood and Deputy Chief Zenelovic told Sergeant Rene that he had an "X on his back."

84.     During that meeting, Chief Wood and Deputy Chief Zenelovic told Sergeant Rene that he should "be smart" and "lay low."

85.     During that meeting, Chief Wood and Deputy Chief Zenelovic told Sergeant Rene that he was "not to appear on social media for the police department."

86.     On several occasions between February 2022 and June 2022, Deputy Chief Zenelovic reminded Sergeant Rene that he was still on Ms. Marini's radar and he should "stay out of the limelight."

87.      In or around Spring 2022, Chief Wood and Deputy Chief Zenelovic told Sergeant Rene to "weather the storm" because Ms. Marini and Mr. Reilich "will not be around forever."

88.     Sergeant Rene is married and was married at all times while he worked at the GPD.

89.     During the Spring and Summer of 2022, Deputy Chief Parina and Deputy Chief Zenelovic repeatedly disrespected Sergeant Rene and his marriage by inappropriately taunting

Sergeant Rene that Ms. Marini "hated him so much" that he must have not called her after having sexual relations with her.

*Sabotage of School Resource Officer Agreement*

90.    For several years, Sergeant Rene supervised and developed the school resource officer program in Greece schools.

91.    Among other objectives, school resource officers were specifically responsible for initiating, developing and maintaining positive relationships with youth from disenfranchised and underserved minority communities in Greece.

92.    Upon information and belief, in June 2022, Greece and the Greece Central School District had an agreement that the schools would pay $240,000 for two school resource officers in the schools, an increase of $50,000 from 2021.

93.    The local news reported that in or about August 12, 2022, Mr. Reilich demanded "tweaks" to the agreement – specifically, an additional $90,000 for the school resource officers.

94.    Upon information and belief, Defendants knew this "tweak" would end the GPD school resource officer program because the school would not be able to change its budget on short notice.

95.    Upon information and belief, Defendants' sabotage of the program that Sergeant Rene had spearheaded for nearly a decade was additional retaliation and an adverse employment action against Sergeant Rene.

*Job Assignment Retaliation*

96.    In late October 2022, the GPD twice posted the position of CID Sergeant and did not fill the position when Sergeant Rene was the most senior, qualified and in one instance, the *only* individual to apply.

12

97.     Deputy Chief Zenelovic told Sergeant Rene that he tried to get him the position, but that it was tough because Sergeant Rene was "so despised" at Town Hall.

***Internal Affairs Investigation***

98.     On January 31, 2023, Sergeant Rene received notice that he was the subject of a "mislaid property" internal affairs ("**IA**") investigation.

99.     On February 8, 2023, Deputy Chief Aaron Springer ("**Deputy Chief Springer**") ordered Sergeant Rene to appear and be interrogated without counsel or a union representative.

100.     Deputy Chief Springer's order was a violation of the Taylor Law.

101.     At his interrogation, Sergeant Rene learned that the IA investigation was about the Cell Phone MOU stipend Greece included in his pay.

102.     In November or December 2022, Sergeant Rene had turned in the cell phone upon request of the GPD.

103.     Sergeant Rene had no control over Greece's payment of the stipend.

104.     Sergeant Rene had no ability to terminate Greece's payment of the stipend.

105.     For several weeks, Greece continued to include the approximately $80 weekly stipend in Sergeant Rene's paycheck.

106.     Upon information and belief, while Greece knowingly and voluntarily continued to pay the stipend after it knew that the phone had been returned, one or more of the Defendants caused the GPD to open an IA investigation into Sergeant Rene for receiving the stipend.

107.     Upon information and belief, the IA investigation was requested, commenced and prosecuted in bad faith for the purpose of retaliating against Sergeant Rene.

108.     Upon information and belief, the IA investigation was requested, commenced and prosecuted in bad faith for the purpose of impugning Sergeant Rene's reputation and credibility.

109.    Sergeant Rene was cleared of misconduct in the IA investigation.

110.    Even though Sergeant Rene was cleared in the IA investigation regarding the stipend, Greece deducted $4,769.35 from Sergeant Rene's wages.

111.    On his behalf, the Union filed a PERB charge and grievance(s) related to the IA investigation and the improper wage deduction.

***Use of PTO Time***

112.    Over his fifteen (15) years of service, Sergeant Rene acquired earned time off ("**PTO**").

113.    Before April 11, 2023, GPD Sergeants were responsible for GPD staffing levels and as such, approved each other's use of PTO.

114.    On April 11, 2023, GPD Sergeants were directed that in the absence of an emergency, PTO use requests were to be made in advance to their platoon Lieutenant.

115.    On June 27, 2023, Sergeant Rene experienced an emergency that included sudden and severe back muscle spasms.

116.    At about 3:30 a.m., Sergeant Rene believed that he would not be fit for duty for his shift starting at 6:00 a.m.  Sergeant Rene's Lieutenant was not on duty at that time and was in North Carolina.

117.    Sergeant Rene called the Sergeant who was on duty to report his health emergency and likely absence, but agreed to try to come in at a later time if he felt better.

118.    Sergeant Rene could have stayed home and used sick time without any approval, but agreed to try to come in later because he did not want to leave the shift shorthanded.

119.    Sergeant Rene reported for duty at 8:30 a.m. and used 2.5 hours of PTO.

120.    Lieutenant Andrew Potter ("**Lieutenant Potter**") told Sergeant Rene that he should have called him at 3:30 a.m. to report the health emergency and he was worried that Chief Wood "would use" this situation as an excuse to "go after him (Sergeant Rene) and the platoon."

121.    Weeks later on July 12, 2023, Lieutenant Potter approved Sergeant Rene's use of PTO on July 13, 2023.  Sergeant Rene's July 12 shift was scheduled to start at 8:00 a.m.

122.    On July 13, 2023, Sergeant Rene's morning appointment ran long and he called the Sergeant on duty to report his issue.  The Sergeant on duty told him he was not needed until 9:00 a.m.  At about 9:00 a.m. on that day, by text message, Lieutenant Potter approved Sergeant Rene's use of the additional hour of PTO.

123.     On or about July 14, 2023, Lieutenant Potter told Sergeant Rene that Deputy Chief Zenelovic had ordered him to write counseling memoranda to Sergeant Rene for his use of PTO on June 27 and July 13.

124.    Lieutenant Potter told Sergeant Rene that he did not agree with the order, but that he had to follow the order.

125.    On July 18, 2023, Deputy Chief Zenelovic and Lieutenant Potter delivered counseling memoranda to Sergeant Rene for his use of PTO on June 27 and July 13.

126.    During the meeting, Deputy Chief Zenelovic reminded Sergeant Rene that he had "poor standing with Town Hall" and that Chief Wood had put an "X on his back" because of the Union grievances and PERB charge related to the cell phone stipend IA.

127.    The counseling memoranda constituted an adverse employment action and was another act of retaliation against Sergeant Rene.

128.    Deputy Chief Zenelovic ended the meeting by telling Sergeant Rene that he considered this issue resolved and gave him a "bro hug."

129.    Almost a month later on August 14, 2023, Chief Wood sent an email to Sergeant Rene scheduling a meeting "to explain (his) contemplation of further administrative action" with respect to his use of PTO time on June 27 and July 13.

130.    On August 17, 2023, Chief Wood told Sergeant Rene that he would be disciplined for the use of 3 hours of his PTO.  Chief Wood offered Sergeant Rene the choice to "forfeit six (6) holiday days immediately and (6) vacations days over the next six months."

131.    Chief Wood's offer would require Sergeant Rene to work (and lose) 96 hours of PTO time for his use of 3 PTO hours on June 27 and July 13.  Chief Wood further advised that his "offer" would expire the next day.

132.    There was nothing in Sergeant Rene's employment history, no conduct, no prior punishments, no provision in the CBA or any course of conduct between the Union and GPD that would have supported or justified Chief Wood's proposed punishment.

133.    Chief Wood's offer was improper and illegal as it was a continuation of retaliation at the direction of Town Hall for Sergeant Rene's whistleblowing and as admitted by Deputy Chief Zenelovic, also in retaliation for the Union grievances and PERB charge filed on Sergeant Rene's behalf.

134.    On August 18, 2023, Sergeant Rene agreed to the forfeiture of 12 days of PTO.

135.    As promised by Chief Wood, Sergeant Rene considered the matter closed and believed that there would be no further administrative action.  Sergeant Rene was wrong.

136.    On August 24, 2023, Chief Wood sent Sergeant Rene an agreement to sign that contained additional and different terms than those the parties had agreed to.

137.    By and through counsel, Sergeant Rene refused to sign the agreement with the additional terms but confirmed that he remained willing to forfeit the 12 days.

16

***Sexual Harassment Complaint***

138.    Upon information and belief, on August 24, 2023, a GPD Deputy Chief initiated intimate contact with a female officer in the field and in front of a suspect and other officers.  One or more of the officers believed that the contact appeared unwelcomed and that the Deputy Chief may have violated Greece's sexual harassment policy (the "**Sexual Harassment Complaint**.")

139.    On or about August 25, 2023, an officer reported his concerns to his supervisor Sergeant Rene.

140.    On August 26, 2023, Sergeant Rene reported the matter to his supervisor Lieutenant Potter who was in North Carolina.  Lieutenant Potter told Sergeant Rene that he reviewed the sexual harassment policy and he would be reporting the matter to the personnel department.

***All Future PTO Requests "Will Be Denied"***

141.    On August 28, 2023, Lieutenant Potter told Sergeant Rene that his PTO request for August 31, 2023 and vacation request for September 5, 2023 were denied.

142.    Lieutenant Potter told Sergeant Rene that he "should expect" the GPD to deny any and all "of [his] future requests" for use of his PTO.

143.    Upon information and belief, the denial of future use of PTO was another action taken in retaliation against Sergeant Rene.

***Fall-Out from the Sexual Harassment Complaint***

144.    On August 29, 2023, Lieutenant Potter returned to work after his trip to North Carolina.

145.     At the beginning of Lieutenant Potter's shift, Chief Wood and the Deputy Chief involved in the Sexual Harassment Complaint met with Lieutenant Potter.

146. Upon information and belief, at the conclusion of that meeting, Chief Wood ordered Lieutenant Potter to turn in his badge and the Deputy Chief escorted him out of the GPD building.

147. Sergeant Rene was immediately concerned that Lieutenant Potter's removal was related to the Sexual Harassment Complaint.

148. As a result, Sergeant Rene submitted the Sexual Harassment Complaint directly to the Greece Personnel Department.

149. On September 1, 2023, town attorney Karlee Bolaños interviewed Sergeant Rene about the Sexual Harassment Complaint.

150. On September 1, 2023, Ms. Bolaños interviewed the female officer identified in the Sexual Harassment Complaint.

151. At the end of the female officer's interview, Ms. Bolaños turned off the recording device and asked her if she thought Sergeant Rene had made the report in "an effort to advance his career."

152. On September 2, 2023, Ms. Bolaños interviewed Sergeant Rene again to discuss alleged "inconsistencies" in witness statements.

153. During his second interview, Sergeant Rene asked Ms. Bolaños about why she had turned off the recording device and asked the female officer if she thought he made the report in an effort to advance his career.

154. Ms. Bolaños, in front of Greece's personnel director Keith Suhr, responded that she asked that question because she was trying to protect Sergeant Rene.

155. Ms. Bolaños' statement reflects her knowledge that Sergeant Rene needed protection.

***Ultimatium and Resignation***

156.    On or about September 21, 2023, Sergeant Rene learned that Chief Wood was "furious" that he had not signed the settlement agreement that he had sent to Sergeant Rene in connection with the 12-day forfeiture.

157.    Sergeant Rene was told that there would be additional consequences for not signing the agreement, which Sergeant Rene believed would be a continuation of Chief Wood's efforts to push him out of the GPD.

158.    For well over a year, Sergeant Rene had lived with the constant stress of knowing that he was "despised by Town Hall," that he had an X on his back and that the other senior officers who had reported corruption had already been pushed out of the GPD, denied health insurance, and, in one case, decertified.

159.    For well over a year, Sergeant Rene had lived with the stress of knowing that the supervisors who were supposed to protect him from politics, improper influence and retaliation were the same supervisors following Town Hall's retaliatory orders.

160.    For well over a year, Sergeant Rene experienced severe stress, anxiety and fear about what the Defendants would do next to further harm him, his reputation and his career. During this time, Sergeant Rene was experiencing stress related illnesses.  Sergeant Rene was unable to sleep.  Sergeant Rene was unable to enjoy time with his family as his mind was consumed with concern about Defendants' next actions.

161.    Sergeant Rene had spent nearly 15 years in the Greece community serving as a role model and developing relationships with co-workers, residents and especially Greece's youth.

162.    Sergeant Rene had intended on retiring from the GPD.

163.     On September 22, 2023, unable to continue to work under these circumstances and for his health and family, Sergeant Rene resigned from the GPD.

***Personnel File Misconduct***

164.     After his resignation, Sergeant Rene applied for a position in a different law enforcement department (the "**New Employer**.")

165.     On September 26, 2023, the New Employer contacted the GPD and asked to review Sergeant Rene's personnel file in connection with its background check.

166.     Before September 26, 2023, GPD personnel files were routinely and promptly provided to departments completing background checks.

167.     When the New Employer requested to see Sergeant Rene's file, Chief Wood refused to allow Sergeant Rene's file to be reviewed, because the Defendants were "not done with it."

168.     When Sergeant Rene's personnel file was finally released, it contained documents added after his resignation.

169.     Specifically, his file contained notes regarding the opening of two (2) internal affairs investigations involving Sergeant Rene, which upon information and belief, had not been opened while Sergeant Rene was at the GPD.

170.     Sergeant Rene was told that one note referenced an internal affairs investigation into an "untimely report of sexual harassment complaint," while the other referenced a FOIL request.

171.     Upon information and belief, these documents were added to Sergeant Rene's personnel file to give the appearance that Sergeant Rene had left the GPD during open internal affairs investigations, which can be grounds for police officer decertification in New York.

172.   Upon information and belief, these documents were added to Sergeant Rene's personnel file so that potential law enforcement employers would not hire him.

173.   Greece's addition of these documents represents additional retaliation against Sergeant Rene.

***GPD's Post-Resignation Efforts to Retaliate Against and Smear Sergeant Rene***

174.   In or around August 2023, an individual ("**FOIL Applicant**") submitted a Freedom of Information Law ("**FOIL**") request, seeking the identification of individuals who searched his name on Greece computers.

175.   The Town Clerk responded to the FOIL request identifying three (3) GPD employees and three (3) civilians who had searched his name on Greece computers. The Town Clerk further noted that the FOIL request was closed.

176.   Sergeant Rene had searched the FOIL Applicant's name on a "LERMS" system, which is a database that maintains details of individuals' contacts with the police department including, but not limited to whether that individual is a complainant, victim, witness or suspect.

177.   Absent ethically improper motives, such as running the name of an ex-girlfriend, this type of search is not only routine, but allowed by policy, procedures and law.

178.   Sergeant Rene's search of the FOIL Applicant's name was proper and consistent with GPD policy and New York law.

179.   Upon information and belief, approximately two (2) weeks after Sergeant Rene submitted the Sexual Harassment Complaint to Greece's personnel department, Deputy Chief Springer used the information on the FOIL request to contact the FOIL Applicant and request a meeting.

180.    Upon information and belief, during that meeting, together with additional communications, Deputy Chief Springer told the FOIL Applicant that Sergeant Rene had acted improperly and/or illegally in running his name on the LERMS system.

181.    Upon information and belief, Deputy Chief Springer told the FOIL Applicant that Sergeant Rene left the GPD to avoid accountability for his misconduct.

182.    Upon information and belief, Deputy Chief Springer told the FOIL Applicant that bad cops accept demotions and lower pay to escape punishment.

183.    Upon information and belief, Deputy Chief Springer encouraged the FOIL Applicant to consider that, based on his new employment, Sergeant Rene had taken a demotion and accepted lower pay to avoid accountability.

184.    Upon information and belief, in or around December 2023 and January 2024, Deputy Chief Springer had additional communications with the FOIL Applicant encouraging him to ask Sergeant Rene's New Employer to investigate him for misconduct.

185.    Upon information and belief, Deputy Chiefs do not typically contact individuals who file FOIL requests to discuss individual officers.

186.    Upon information and belief, Deputy Chief Springer met with the FOIL Applicant to disparage Sergeant Rene and encourage him to file a complaint with Sergeant Rene's New Employer as part of a smear campaign to impugn Sergeant Rene's reputation in further retaliation for his whistleblowing and the Union actions taken on his behalf.

187.    Deputy Chief Springer's actions exacerbated Sergeant Rene's stress as he worried that Defendants would not stop until they ruined his career.

**Post-Resignation Smear Campaign**

188.    After Sergeant Rene resigned, several members of the GPD, other departments and community members expressed shock that Sergeant Rene had left the GPD and speculated about the abhorrent treatment he had received from GPD's command staff.

189.    Upon information and belief, on October 31, 2023, Chief Wood sent an email to the entire GPD.

190.    In that email, Chief Wood stated "[m]y expectations are not difficult to meet. Show up for work at the appointed time and do an honest day's work for the public to the best of our ability, just like it says in the oath we take.  Don't be insubordinate, truly earn the money we make, and don't try to keep monies that we know don't belong to us.  Yes, unfortunately, I had to say that.  I would have never expected many years ago, when I started in this profession, that I would need to remind sworn officers not to break the law and be blatantly dishonorable. . . . [w]e have an incredible group of smart, talented professionals in this organization that I refuse to have dragged down by a few people. Conduct that blatantly flies in the face of what this profession represents will not be tolerated and will be swiftly dealt with."

191.    Upon information and belief, Chief Wood drafted this email, in part, to smear and disparage Sergeant Rene by insinuating that he was a dishonorable and law-breaking individual.

192.    Upon information and belief, Deputy Chief Wood's disparaging remarks were intended to further harm and discredit Sergeant Rene and were in further retaliation for his whistleblowing activities and the Union actions taken on his behalf.

193.    In or around February 2024 and months after Sergeant Rene left the GPD, Deputy Chief Parina told individual(s) that he had personal knowledge of the GPD's investigations into Sergeant Rene and that there was "lots of evidence" that Sergeant Rene was a bad cop and "got what was coming to him."

194.    Upon information and belief, Deputy Chief Parina's disparaging remarks were retaliatory and intended to further harm, smear and discredit Sergeant Rene.

**Unpaid Overtime**

195.    In addition to Defendants' violations of Civil Rights laws and Civil Service Law regarding retaliation, Greece also violated wage and hour laws.

196.    During 2022 and 2023, Sergeant Rene was normally and regularly scheduled to work 40 hours a week.

197.    During 2022 and 2023, Sergeant Rene was routinely expected to work several hours in addition to his normally scheduled times.  On average, Sergeant Rene worked an additional 3-5 hours a week.

198.    For example, during the last week of June 2022 in connection with Greece's July 4th celebration, Sergeant Rene worked several extra hours to assist Deputy Chief Zenelovic in the planning of the event, including coming in early and taking phone calls after hours.

199.    During 2022 and 2023, Sergeant Rene was often not paid for hours worked outside of his 40-hour per week schedule as he had been ordered by Deputy Chief Zenelovic and Chief Wood to not put in time outside of his scheduled time.

200.    When Sergeant Rene put time in for off-duty department required work, Chief Wood and Deputy Chief Zenelovic ordered him to exclude such time from his timesheet stating, "we will not nickel and dime this department."

201.    Sergeant Rene worked, on average, approximately 4 extra unpaid hours a week during 2022 and 2023 for which he was not compensated and did not accrue benefits.

**Damages**

202.    Following his constructive discharge from the GPD, Sergeant Rene was hired by another law enforcement department.  Sergeant Rene's pay and benefits are now significantly less than they were at the GPD.

203.    Sergeant Rene's constructive discharge also excluded his ability to receive lifetime retiree health insurance benefits offered by the GPD.

204.    The decreased pay and benefits also negatively impacted Sergeant Rene's pension.

205.    Sergeant Rene was also damaged in the amount of his unpaid overtime.

206.    Sergeant Rene is also entitled to an award in the amount of the cell phone stipend that was wrongly deducted from his wages.

207.    As a result of the Defendants' retaliation, Sergeant Rene experienced severe emotional distress and stress related illnesses.  Sergeant Rene had trouble sleeping.  Sergeant Rene's personal relationships were impacted by his stress.

208.    As a result of Defendants' action, Sergeant Rene's career goals and career trajectory have been irreparably damaged.

**FIRST CAUSE OF ACTION**
**UNDER N.Y. CIVIL SERVICE LAW § 75-b**
**Against All Defendants**

209.    Sergeant Rene hereby realleges and restates as if fully set forth herein all of the allegations set forth in the preceding paragraphs.

210.    Civil Service Law § 75-b makes it unlawful to "dismiss or take other disciplinary or other adverse personnel action against a public employee regarding the employee's employment because the employee discloses to a governmental body information: (i) regarding a violation of a law, rule or regulation which violation creates and presents a substantial and specific danger to the

public health or safety; or (ii) which the employee reasonably believes to be true and reasonably believes constitutes an improper governmental action."

211. "Improper governmental action" means "any action by a public employer or employee, or an agent of such employer or employee, which is undertaken in the performance of such agent's official duties, whether or not such action is within the scope of his employment, and which is in violation of any federal, state or local law, rule or regulation."

212. At all relevant times before his resignation, Sergeant Rene was a public employee covered under N.Y. Civil Service Law § 75-b.

213. At all relevant times, Greece was a public employer covered under N.Y. Civil Service Law § 75-b.

214. At all relevant times, Chief Forsythe, Acting Chief Helfer, and Special Deputy Chief Morabito were "governmental bodies" within the meaning of Civil Service Law § 75-b.

215. In Spring 2021, Sergeant Rene reported to Chief Forsythe that Ms. Marini and Mr. Reilich were executing a plan that had a disparate impact on minorities living in Greece.

216. On December 8, 2021, Sergeant Rene reported to Special Deputy Chief Joseph Morabito, who was authorized to conduct an investigation on behalf of the Town, that he believed Ms. Marini had engaged in an attempted cover-up of a crime.

217. Sergeant Rene had a good faith basis for believing that a cover-up had taken place or been attempted, because he had been instructed by Ms. Marini to tell members of the media that the accident was "minor" and alcohol was not a factor.

218. Sergeant Rene suffered adverse personnel actions for his reports of racial discrimination and Ms. Marini's attempt to conceal a crime.

219.     Following Sergeant Rene's reports, he was removed from his role as Public Information Officer and reassigned from the Community Services Division to Road Patrol.  The programs and initiatives Sergeant Rene had worked on were defunded, deprioritized and/or shut down.

220.     Greece removed School Resource Officers from Greece schools, a program which Sergeant Rene had spearheaded.

221.     Greece then opened an IA into Sergeant Rene for "mislaid property," when it had intentionally continued to pay Sergeant Rene his stipend.

222.     Greece and Chief Wood refused to allow Sergeant Rene a union or other representative his compelled interview or the IA investigation.

223.     Despite ultimately finding no misconduct, Greece then wrongfully deducted Sergeant Rene's wages.

224.     In further retaliation, Sergeant Rene was denied a favorable assignment, even when he was the only applicant and was qualified.

225.     After Sergeant Rene allegedly failed to follow a new policy when taking PTO, Chief Wood demanded that he forfeit 12 days of vacation time and holiday time, a disciplinary action not provided for in Sergeant Rene's CBA.

226.     After Sergeant Rene accepted his offer, Chief Wood reneged on the agreement, instead providing Sergeant Rene with a settlement agreement which fraudulently identified the forfeiture days as "suspension days," and additional unnegotiated terms.

227.     If Sergeant Rene did not accept this arbitrary, excessive punishment, and waive his rights, Chief Wood threatened additional penalties.

228.     Sergeant Rene was also told that all future PTO requests would be denied.

229.     Sergeant Rene was also retaliated against for reporting sexual harassment, with the Defendants questioning his motives.

230.     Faced with this continuing retaliation and vindictiveness, Sergeant Rene was forced to resign from his position, believing that Defendants would not stop until they were able to fabricate cause to terminate his employment and further harm him.

231.     The adverse personnel actions were causally related to Sergeant Rene's reports of improper governmental action.  As noted above, GPD Command staff repeatedly told Sergeant Rene that he had an "X on his back," that he was a "target" of Town Hall, and Town Hall "despised" him.

232.     Defendants' contempt and retaliation even continued after Sergeant Rene resigned, as Greece representatives continued to disparage Sergeant Rene and attempt to interfere with his employment prospects.

233.     As a direct and proximate result of Defendants' retaliatory actions, Sergeant Rene has suffered economic damages in an amount to be determined by a trier of fact, including lost compensation and benefits, and front pay.

234.     Sergeant Rene is also entitled to the recovery of reasonable attorney's fees and punitive damages pursuant to New York Civil Service Law § 75-b.

<u>**SECOND CAUSE OF ACTION**</u>
<u>**UNDER 42 U.S.C. § 1983**</u>
<u>**Against All Defendants**</u>

235.     Sergeant Rene repeats and realleges each and every preceding allegation as if fully set forth herein.

236.     Pursuant to the First Amendment to the United States Constitution, every citizen may freely speak, write or publish their thoughts as it relates to matters of public concern.

237.    Defendants, acting as State representatives, violated Sergeant Rene's First Amendment rights by retaliating against him for exercising his freedom of speech as a citizen with regard to a matter of public concern by reporting Defendants' disparate treatment of minority populations.

238.    Defendants, acting as State representatives, violated Sergeant Rene's First Amendment rights by retaliating against him for exercising his freedom of speech as a citizen with regard to a matter of public concern by reporting unethical, illegal and corrupt practices by the Defendants in attempting to cover up Chief Forsythe's DUI accident.

239.    Defendants, acting as State representatives, violated Sergeant Rene's First Amendment rights by retaliating against him for exercising his freedom of speech as a citizen with regard to a matter of public concern by filing Union grievances and a PERB charge with respect to Chief Wood's refusal to allow him a Union representative and improper deduction of wages.

240.    Defendants, acting as State representatives, violated Sergeant Rene's First Amendment rights by retaliating against him for exercising his freedom of speech as a citizen with regard to a matter of public concern by reporting the alleged sexual harassment of a coworker by Deputy Chief Zenelovic.

241.    Defendants retaliated against Sergeant Rene in numerous ways, including but not limited to:

- removing him from his positions as PIO and CSS,

- issuing him a reprimand,

- opening a bad faith internal investigation,

- refusing to allow him a Union representative in a compelled interview,

- deducting his wages without any process,

- trying to force him to forfeit 12 days of vacation and holiday time under threat of an additional unjustified internal punishment,

- constructively discharging him,

- disparaging and impugning his reputation, and

- attempting to interfere with his employment prospects after he was forced to resign.

242.  As a direct and proximate result of Defendants' retaliatory actions against Sergeant Rene, he has suffered and continues to suffer a loss of past and future income, monetary damages, humiliation, severe emotional distress, mental and physical anguish and suffering, in an amount to be determined by a trier of fact.

243.  Defendants' actions constitute a violation of Sergeant Rene's rights under the United States Constitution.

244.  Defendants' retaliatory actions were under the color of state law.

245.  Defendants knew, or should have known, that their retaliatory acts against Sergeant Rene because of his protected statements, as described above, were a violation of Sergeant Rene's rights under the United States Constitution.

246.  Upon information and belief, Defendants' retaliatory actions were taken pursuant to official policies, practices, and/or customs.

247.  Upon information and belief, Defendants' retaliatory actions were taken by final decision-makers for purposes of Section 1983 liability.

248.  The Defendants acted maliciously, willfully, and in wanton and reckless disregard of Sergeant Rene's constitutional rights when they took the action, in violation of Sergeant Rene's civil rights, as provided in 42 U.S.C. § 1983.

249.     As a result of the foregoing, Sergeant Rene must be made whole, with back pay, front pay and benefits, emotional and reputational damages, punitive damages, prejudgment interest, and attorney's fees.

### THIRD CAUSE OF ACTION
### UNDER THE FAIR LABOR STANDARDS ACT
### Against Defendant Town of Greece

250.     Sergeant Rene repeats and realleges each and every preceding allegation as if fully set forth herein.

251.     Under Section 7 of the FLSA, codified at 29 U.S.C. § 207, employees are entitled to be compensated at a rate of at least one and one-half times their "regular rate" of pay for all time worked in excess of 40 hours per workweek.

252.     Greece knew or should have known that their pay and reimbursement policies, practices and methodology resulted in failure to provide required overtime compensation for over 40 hours worked in a workweek.

253.     As part of his PIO duties, Sergeant Rene was required to monitor and respond to communications from members of the media outside of his regular duty hours.

254.     This would frequently result in Sergeant Rene working over forty hours per week.

255.     After his appointment, Chief Wood confronted Sergeant Rene about his use of overtime.  Chief Wood told Sergeant Rene to "stop nickel and diming the Department."

256.     Sergeant Rene understood this to mean that he was not permitted to submit accurate time records reflecting the work he was performing for Greece.

257.     Accordingly, believing that Defendants would punish him if he did not comply, Sergeant Rene stopped recording the additional hours he worked performing tasks including answering phone calls and responding to requests.

258.    Greece, pursuant to their policy and practice, violated the FLSA by failing and refusing to pay federal overtime compensation to Sergeant Rene.

259.    Sergeant Rene is entitled to damages equal to the Federal overtime pay at time and a half his regular rate plus periods of equitable tolling, because Greece acted willfully and knew, or showed reckless disregard for, whether their conduct was unlawful.

260.    Greece has acted neither in good faith nor with reasonable grounds to believe that their actions and omissions were not a violation of the FLSA, and as a result, Sergeant Rene is entitled to recover an award of liquidated damages in an amount equal to the amount of unpaid overtime wages under 29 U.S.C. § 216(b).  Alternatively, should the Court find Greece did act in good faith and with reasonable grounds in failing to pay overtime compensation, Sergeant Rene is entitled to an award of prejudgment interest at the applicable legal rate.

261.    As a result of the aforesaid willful violations of the FLSA's overtime provisions, overtime compensation has been unlawfully withheld by Greece from Sergeant Rene. Accordingly, Greece is liable under 29 U.S.C. § 216(b), together with an additional amount as liquidated damages, pre-judgment and post-judgment interest, reasonable attorneys' fees, and costs of this action.

**WHEREFORE**, Jared Rene respectfully requests judgment as follows:

A.    Damages in the form of loss of past wages, pensions contributions, lost wages as a result of being deprived of promotions, future wages, as well as punitive damages and pain and suffering in an amount not less than $2,090,000;

B.    Statutory civil penalties as allowed in the causes of action set forth above;

C.    Costs of suit;

D.    Reasonable attorney's fees;

E.      Prejudgment and post judgment interest.

F.      Declaratory and Injunctive Relief enrolling Jared Rene into the Greece Gold Badge

Club retiree insurance; and

G.      Such other and further relief as the court deems proper.


Dated: Rochester, New York                    Respectfully submitted,
            April 9, 2024


                                                       /s/ *Maureen T. Bass*
                                                       _____

                                                       ABRAMS FENSTERMAN, LLP
                                                       Maureen T. Bass, Esq.
                                                       Alexander Fantauzzo, Esq.
                                                       2280 East Avenue, First Floor
                                                       Rochester, New York 14610
                                                       Phone: (585) 218-9999
                                                       Mbass@abramslaw.com
                                                       AFantauzzo@abramslaw.com
                                                       *Attorneys for Jared Rene*